IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 14, 2013

## GLENARD THORNE v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2007-A-591     Steve Dozier, Judge**

_____

**No. M2012-02518-CCA-R3-PC - Filed August 26, 2013**

_____

A Davidson County jury convicted, the Petitioner, Glenard Thorne, of two counts of aggravated robbery, one count of aggravated burglary, two counts of facilitation of aggravated rape, and two counts of especially aggravated kidnapping, and the trial court sentenced him to a fifty-two year effective sentence. This Court affirmed the judgments and sentence on appeal. *State v. Lance Sandifer, et. al*, No. M2008-02849-CCA-R3-CD, 2010 WL 5343202, at *1 (Tenn. Crim. App., at Nashville, Dec. 21, 2010), *perm. app. denied* (Tenn. May 26, 2010). The Petitioner timely filed a petition for post-conviction relief, which the post-conviction court dismissed after a hearing. On appeal, the Petitioner contends that he received the ineffective assistance of counsel at trial. After a thorough review of the record and applicable authorities, we conclude that the post-conviction court did not err when it dismissed the petition. The post-conviction court's judgment is, therefore, affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JERRY L. SMITH and JAMES CURWOOD WITT, JR., JJ., joined.

Elaine Heard, Nashville, Tennessee, for the Appellant, Glenard Thorne.

Robert E. Cooper, Jr., Attorney General and Reporter; Kyle Hixon, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Rachel Sobrero, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I. Facts**

## A. Trial

This case arises from a rape and robbery that occurred at a home/office recording studio. This Court summarized the facts presented at the Petitioner's trial on charges stemming from these events as follows:

In November 2006, R.N. and A.B. were roommates living in a two bedroom apartment in which they also ran a recording studio. R.N.'s bed and belongings were located in one bedroom, and A.B.'s bed was located in the dining room. The recording studio was located in the second bedroom. In the early morning of November 7, 2006, R.N. and A.B. were at the apartment. R.N. received a telephone call from [the Petitioner]. [The Petitioner] wanted to come to R.N's apartment to pay for studio time he had previously used. [The Petitioner] and Tornita Crenshaw arrived at the apartment around 5:00 a.m. A.B. was sleeping in her bed in the dining room. [The Petitioner], Crenshaw, and R.N. woke up A.B. She asked them to leave. [Tthe Petitioner] and Crenshaw left. A.B. moved to R.N.'s bedroom and went back to sleep.

Around 7:00 a.m., [the Petitioner] and Crenshaw returned. R.N. opened the door to let them into the apartment. As he was closing [the] door, Lance Sandifer and Stephon Cunningham forced their way into the apartment. Sandifer and Cunningham were brandishing a shotgun and a pistol. R.N. was ordered to get the recording equipment unplugged so the four Appellants could take the equipment. A.B. awoke to the sound of fighting. She saw [the Petitioner] pointing a gun at R.N. [The Petitioner] then pointed the gun at A.B. and ordered her into the living room.

Sandifer was in the living room holding a shotgun. When A.B. came into the living room, Sandifer took her PDA. Sandifer ordered A.B. to sit on the couch. He told her to undress. When A.B. hesitated, Sandifer yelled, "Bitch, this isn't a game. I will shoot you. Take your clothes off." A.B. complied with the request and laid down on the couch. At this time, R.N. was sitting on the end of the couch with [the Petitioner] pointing a gun at him. Sandifer ordered R.N. to perform cunnilingus on A.B. R.N. attempted to pretend to perform cunnilingus. Sandifer realized that R.N. was pretending and ordered him to do it again. R.N. performed cunnilingus as Sandifer ordered. After a few minutes, Sandifer ordered R.N. to digitally penetrate A.B.'s vagina. R.N. complied. These acts were all completed at gunpoint. [The Petitioner] took R.N. into the studio to unhook the equipment.

Sandifer retrieved a mop from the kitchen. Sandifer inserted the mop handle into A.B.'s vagina and twisted it around for about five minutes. Sandifer ordered A.B. to turn over, and he attempted to insert the mop handle into her anus. A.B. estimated that the mop handle went into her anus a half inch to an inch. Sandifer was not satisfied with the depth the mop handle would go into A.B.'s anus. He ordered her to turn over and insert the mop handle into her vagina herself. At some point Sandifer digitally penetrated A.B.'s vagina and forced her to smell his fingers. He subsequently ordered her to masturbate by inserting her own fingers into her vagina. Sandifer asked if anyone had a condom, but Appellants all replied that they did not. Sandifer started to force A.B. to fellate him, but [the Petitioner] told Sandifer that they were in a hurry and needed to leave. Crenshaw allowed A.B. to get dressed in the bedroom.

Throughout the sexual assaults, Sandifer was brandishing a weapon, and Appellants were carrying recording equipment and various items out of the apartment. Appellants were trading the weapons back and forth amongst themselves. While she was being raped, A.B. stated that Crenshaw came into the room and said, "Damn, you guys have her naked." Crenshaw smirked as she spoke. Crenshaw also pointed a gun at A.B.'s head during the rapes and demanded R.N.'s car and alternatively A.B.'s car. A.B. stated that the three other Appellants were laughing and joking about her situation while they carried the recording equipment out to the cars in the parking lot.

When A.B. returned to the living room from changing her clothes, R.N. was tied to a chair. R.N. testified that Appellants tied him to the chair with electrical cord. Sandifer and Cunningham were beating R.N. Crenshaw forced A.B. to strike R.N.

[The Petitioner] asked A.B. if she wanted to leave with them. Because A.B. was fearful that Appellants would kill her if she stayed behind, she asked where they were going. Crenshaw, who was holding a gun at the time, stated that A.B. was coming with them. Cunningham and Crenshaw led A.B. to her own car and placed her in the backseat. When A.B. left the apartment with Cunningham and Crenshaw, R.N. was still tied to the chair. R.N. overheard Sandifer and [the Petitioner] arguing about whether to shoot him. R.N. was able to work his way out of the electrical cord and ran out of a back door in the apartment. Shortly thereafter, [the Petitioner] accidentally shot himself in the foot when he put the gun into the waistband of his pants. While Cunningham, Crenshaw, and A.B. were leaving the apartment, A.B. heard the gunshot and

thought that Sandifer and [the Petitioner] had shot R.N.

R.N. ran to the neighboring apartments beating on doors and asking to use the telephone. Someone gave him a telephone, and he called the police. Shortly thereafter, R.N. saw Officer Kenneth Alexandrow in his patrol car, and R.N. flagged him down. Officer Alexandrow investigated the apartment and saw that it had been ransacked. The condition of the apartment was consistent with R.N.'s description of events.

Detective David Achord was called to the scene. R.N. described the events that had transpired in great detail. He identified [the Petitioner] as one of the perpetrators. R.N. told Detective Achord that Crenshaw, Cunningham, Sandifer, and [the Petitioner] all handled the two weapons during the burglary and rapes. R.N. described the way Appellants would transfer the weapons among themselves. As part of his investigation, Detective Achord collected the mop handle and sent it for DNA testing. The TBI agent who tested the mop found A.B.'s DNA on the mop and concluded that the level of concentration of DNA was much greater than that of someone who had used the mop for cleaning.

Detective Achord obtained an arrest warrant for [the Petitioner]. He discovered that [the Petitioner] was at Meharry being treated for a gunshot wound. When Detective Achord arrived at [the Petitioner]'s hospital room, he discovered Sandifer in the room. Sandifer was in possession of a PDA with the name "Lady Krush" on the screen. Detective Achord knew this to be A.B.'s nickname. Detective Achord seized the PDA. After finding a set of keys to a Lexus, he obtained a search warrant for the car.

After A.B. was taken to her car by Crenshaw and Cunningham, Sandifer and [the Petitioner] came to the parking lot and got into another car, a black Lexus. Sandifer and [the Petitioner] followed Cunningham, Crenshaw, and A.B. to Cunningham's aunt's house. When they arrived at the house, Cunningham's aunt, Denise King, looked at [the Petitioner]'s injury and told him he needed to go to the hospital. She agreed to drive him to Meharry. Sandifer rode with them to the hospital. Cunningham, Crenshaw, and A.B. followed in A.B.'s car. Sandifer stayed at the hospital with [the Petitioner]. Cunningham and Crenshaw drove around with A.B. still in the backseat. They stopped for food. At some point, they returned to the hospital and Sandifer got into the car. Sandifer told A.B. that if he had had a condom, he would have raped her. A.B. asked Crenshaw and Cunningham to let her go. They told her

that they would let her go later. Cunningham and Crenshaw drove to Cunningham's mother's house. They told A.B. to act like she was Crenshaw's sister. Cunningham and Crenshaw went upstairs and left A.B. downstairs with Cunningham's mother and her children.

When she returned downstairs, Crenshaw told A.B. that she wanted to go see another boyfriend and told A.B. they were going to go to the store for some tampons. A.B. and Crenshaw left in A.B.'s car. Crenshaw and the other boyfriend stood next to the car while A.B. remained inside. A.B. was planning to leave in the car if Crenshaw left the keys, but Crenshaw took the keys with her. Crenshaw and the boyfriend had an argument, and Crenshaw drove A.B. back to Cunningham's mother's house.

Crenshaw and Cunningham put A.B. back into the car. They began driving around town. At some point, R.N. called A.B.'s cellphone pretending to be [the Petitioner] in an attempt to lure them to the hospital. Crenshaw, who had A.B.'s phone at the time, answered and immediately recognized R.N.'s voice. Crenshaw told A.B., "[R.N.] done fucked you up 'cause I was gonna take you home, but now, you have to stay with us cause he's got the police up there." Cunningham was driving A.B.'s car at this point, and Crenshaw demanded that he pull the car over. When he complied, Crenshaw engaged the child locks on the rear doors of the car so that A.B. could not escape.

Crenshaw and Cunningham decided they wanted to go to a hotel room. Before doing so, they picked up Kendre Howard and Tracy Phillips. When Howard got into the car, he said he was "strapped." A.B. understood this to mean that Howard was carrying a weapon. She believed that Crenshaw and Cunningham might have picked Howard up so that Howard could kill her.

When they arrived at the hotel, A.B. was forced to go to the front desk and pay for a hotel room with her credit card. While in the hotel room, Howard asked A.B. to fellate him. She refused. Howard did not force her and let the matter drop. A chair in the hotel room was placed in front of the door, and someone sat in the chair the entire night. A.B. was on a bed with Howard and tried to stay awake.

The next morning, Crenshaw, Cunningham, Howard, and Phillips took A.B. to the mall. While there, they demanded that A.B. give them her ATM card and her PIN number. Howard and Phillips withdrew money from A.B.'s account using her ATM card. Crenshaw took some of the money and forced

A.B. to accompany her while she got her nails done. The other individuals took the money and bought clothes. While at the mall, A.B. saw a security guard. However, she was afraid to approach him because she did not know what Crenshaw, Cunningham, Howard and Phillips were willing to do to keep her quiet.

After leaving the mall, they returned to Cunningham's mother's house. When they arrived, A.B. pleaded to be let go. She had been pleading with them throughout the time she was with them. Crenshaw had been telling her maybe later. At this point, they were discussing letting her go but were concerned that she would call the police. She promised not to call. Cunningham relented and agreed to let her go. A.B. caused a scene outside the house in order to get her cellphone back from them. They returned her cellphone, and she left in her car. Once she was in the car, she called her best friend and her parents. She agreed to meet them at a Mapco near her apartment. Her parents called the police. Detective Achord was notified, and he met A.B. at the Mapco.

A.B. described the events to Detective Achord. She agreed to submit to an examination to compile a rape kit. A.B. forgot to tell the nurse that Sandifer placed the mop in her anus, so the nurse did not examine that area of A.B.'s body. The tests run on the rape kit materials did not reveal any pertinent evidence.

A.B. called Detective Achord several days later to tell him that Crenshaw and Cunningham were calling her, texting her and leaving threatening voice mail messages. A.B. also informed Detective Achord that Crenshaw and Cunningham had taken a photograph of themselves with her cellphone during the time they held her captive. On November 17, 2006, Crenshaw and Cunningham were located in a hotel room in Nashville.

*Sandifer*, 2010 WL 5343202, at *2-5. Based upon this evidence, the jury convicted the Petitioner of two counts of aggravated robbery, one count of aggravated burglary, two counts of facilitation of aggravated rape, and two counts of especially aggravated kidnapping, and the trial court sentenced him to a fifty-two year effective sentence.

### B. Post-Conviction Petition

The Petitioner filed a petition for post-conviction relief alleging that he had received the ineffective assistance of counsel. At a hearing on the petition, the parties presented the

following evidence: The Petitioner testified that he first was represented by Graham Prichard. His claims, however, were against his trial counsel ("Counsel"), who represented him beginning approximately six months before his trial and who represented him through the appeal process. The Petitioner said Counsel visited him only "two, three times," and she was unprepared for his trial. He said she did not consult with him about possible defenses or about whether to hire investigators. The Petitioner testified that Counsel did not hire an investigator and never discussed investigating his case. The Petitioner said Counsel never told him of any pretrial motions she intended to file or explain the theories she anticipated the State would use to convict him.

The Petitioner said Counsel did not discuss with him possible defenses. He agreed that he left the crime scene before the victim was raped but said he returned. He then conceded that he was with the others again when the victim was taken from her apartment. The Petitioner said Counsel's trial "strategy" was "to make it where the jury hea[rd] [his] name as less as possible." The Petitioner said he talked with Counsel about a possible defense of intoxication because he was high at the time of the crimes. Counsel told him that intoxication was not a defense in his case.

The Petitioner said Counsel discussed with him the evidence presented at the preliminary hearings and the evidence in the motion for discovery. He said she did not discuss impeachment and his fifth amendment right not to testify. The Petitioner said he did not understand the consequences of his testifying.

The Petitioner testified that he wanted to present multiple witnesses at his sentencing hearing, including teachers, principals, other police officers, his mother and father, etc. The only witness who testified on his behalf during sentencing was his father.

The Petitioner said that the trial transcript reflected that Counsel admitted that she was unprepared for trial. He opined that a different attorney would have gotten him "a deal" or "beaten the charges" for which he was convicted that occurred when he was not present.

The Petitioner said Counsel should have filed a reduction of sentence, Rule 35(b) motion. He also testified that he suffered from mental health issues, and he asked Counsel to have him evaluated. He said he heard "voices," was depressed, and had anger issues. Counsel never had him evaluated. The Petitioner said that prison mental health evaluators had put him on prescription medication. He felt evidence of his mental health would have been useful at sentencing.

The Petitioner said he had only two conversations with Counsel about strategy, neither of which had much substance. He said Counsel did not discuss criminal responsibility for

the actions of another or the theory of renouncing one's involvement with an offense.

The Petitioner said that Counsel did not sufficiently argue that the kidnapping instruction was not proper. He further contended that Counsel never discussed the repercussions of his being labeled as a "sex offender" if convicted. The Petitioner said that Counsel was not "focused" on his trial but, instead, was focused on the death of her boss, which was reflected in the record.

The Petitioner testified that Counsel did not discuss with him that the State intended to use enhancement factors to enhance his sentence. He said that he also did not think that his actions constituted that of a "dangerous offender" because he did not shoot or kill anyone. He clarified that the only person shot was himself.

During cross-examination, the Petitioner testified he wanted Counsel to hire an investigator to look into the State's witnesses. He said Counsel never spoke with the victims or the witnesses who planned to testify at trial. The Petitioner said he wanted Counsel to discuss with him possible defenses, and he wanted her to present a defense of duress and intoxication. He agreed he was present during the commission of these crimes but said he left for a while and then came back. The Petitioner said Counsel never presented evidence about why he left and returned, which may have influenced the jury. The Petitioner further explained that his duress defense was supported because he was not going to "rat" on someone for shooting him, but he did not shoot himself. He explained that a gun was found in the car in which he was riding.

The Petitioner said the "plan" for the robbery was to go into the home and steal the recording equipment. He did not know that his co-defendant intended to rape one of the victims.

Counsel testified, and she speculated that she represented the Petitioner for approximately one year. She said she no longer practiced criminal law regularly, and she had no pending cases before the criminal court.

Counsel did not recall whether she spoke with the Petitioner about what it meant to be a "sex offender" as defined by statute. She did recall his raising concerns about his mental health, but she did not recall the substance of those conversations. Counsel said she believed that she hired an investigator in the case, Rick Barry, but she was unsure.

Counsel said her former supervisor, Ross Alderman, died the Saturday before this trial started on Monday. She said the death was "unexpected" and "devastating." Counsel agreed that she was distracted during the trial and that she was emotionally not prepared. She said

she was crying before the jury walked into the room. She agreed that her emotional state likely impacted her performance at trial. Counsel said that the trial counsel for one of the co-defendants was "first in line" to ask questions, so he asked most of the questions.

During cross-examination, Counsel testified that she left the Public Defender's Office in April 2007 and was appointed to represent the Petitioner as a private attorney. Counsel said her records indicated that she visited the Petitioner in jail nine times, and she also spoke with him at their court appearances. Her time records indicated that she spent 41 hours in court representing the Petitioner and 70.1 hours representing him out of court. She further said she was a "conservative biller" and usually did not document all of her time. The records indicated that she hired an investigator

Counsel testified that she involved Jeff Blum from the Sheriff's Department to assist her in determining whether the Petitioner was competent to stand trial or whether an insanity defense was supported. She said she had experience getting defendants evaluated, and she did not have the Petitioner evaluated because she did not have a question about his ability to understand and participate in their trial conversations.

Counsel said her notes indicated that she copied discovery for the investigator and also viewed CD/DVDs of statements given to police by witnesses and the co-defendants in the case. She testified she wanted the investigator to talk with witnesses, including the two victims. She recalled that the investigator spoke with the male victim but that the investigator either could not locate the female victim or she refused to talk with him.

Based upon this evidence the post-conviction court dismissed the Petitioner's petition. In the order dismissing the petition, the post-conviction court found the following:

> The Court accredits the testimony of [Counsel] and her billing records which demonstrate the time she spent investigating the case, including his mental health issues, and her time spent with the [P]etitioner. The [Petitioner's] father testified at his sentencing hearing and the [P]etitioner has not presented any witnesses to demonstrate how the outcome would have been different had he presented them at the time. The Court finds the [P]etitioner has failed to prove any of his factual allegations by clear and convincing evidence and he has not demonstrated prejudice. Therefore, the petition for post-conviction relief is *denied*.

It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it dismissed his petition for post-conviction relief because Counsel admitted that she suffered a devastating emotional shock less than forty-eight hours before the beginning of his trial. He further notes that Counsel admitted that her shock affected her performance at trial. He further asserts that Counsel did not discuss with him his right not to testify until just before that decision was made during the trial. He states that, therefore, he did not understand the benefits or consequences of his decision to testify.

The State counters that, while the sudden death of Counsel's former supervisor affected Counsel's personal emotional state, the Petitioner made no showing that Counsel's grief adversely affected her trial preparation or her professional performance during the trial. The State further asserts that the Petitioner has similarly not shown that Counsel failed to advise him of his right to not testify. The State asserts that the Petitioner's factual claims are questionable and contain multiple inconsistencies. Finally, the State asserts that the Petitioner cannot prove that he was prejudiced, considering that the proof of his guilt was overwhelming.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2012). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2012). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not

functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland,* 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad,* 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard,

then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

In the case under submission, we conclude that the Petitioner has not proven by clear and convincing evidence that Counsel was ineffective in any respect, including her advice to him about whether or not to testify. Counsel clearly indicated that she was devastated by the unexpected loss of her former supervisor the Saturday before this trial began on Monday. She testified, however, that she spent over 110 hours in court and out of court preparing, investigating, and representing the Petitioner on this case. The trial court accredited counsel's testimony. The Petitioner has not pointed to any specific instances in which Counsel's performance was deficient or how any such alleged deficiency prejudiced him. The Petitioner is not entitled to relief.

## II. Conclusion

After a thorough review of the record and the applicable law, we affirm the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE

-12-